It's good for you to see us as well. Those of you who were here the last time remember we had a rather extensive argument lasting most of the day. The court intends to adhere to the time limits that are specified. We may go over the time limits if any members of the panel have questions, but we would ask counsel to adhere to those time limits. I would like to note the presence of Professor David Sonnershine of Temple University Law School with the students here. Welcome, David. Good to see you. Before we begin, we thought it would be a good idea to ask counsel for the FCC just to come up and in a very brief way tell us where you stand on the 2010 cycle. Just no argument or anything, but just give us some basic facts as to what status of everything is. Jacob Lewis for the FCC. The facts are straightforward. The Commission has issued a notice of inquiry commencing the 2010 quadrennial. It has let out for a contract on an marketplace of updated record. Those studies, I think, are scheduled to come back to be submitted to the Commission on the order of, my understanding is, during the month of April and early May. And at that point, the Commission, I think, will be in a position to take further steps, either in NPRM and then final rules, after those studies are in place. Obviously, the record is extremely important in these type of cases, and so until those studies are in there, the Commission awaits those studies before it's taking further action on the quadrennial. Well, good. Any questions? No. Good. Thank you very much. Good. Mr. Schwartzman. Morning. May it please the Court, Andrew Schwartzman for the citizen petitioners. I am going to utilize 20 minutes of time to discuss the newspaper broadcast cross-ownership rule aspect of the case, and my colleague Corey Wright will address the TV ownership and diversity issues. Could you start with the notice issue that come to bear first? The initial notice, the valid notice in terms of APA publication and so forth, which appears at page 1954 of the joint appendix, was a spare notice that did not come close to meeting the standard of apprising the Commission ultimately intended to do, and we contend that that notice is inadequate. Now, does that notice, in effect, yes, it's a short notice, but doesn't it, in effect, tag along with the 2002 notice? And then also, of course, you've had a ruling from our court in 2004, so didn't everybody know what the game was all about? Well, certainly we knew what the game was about, and the FCC received a large number of comments, but what it didn't give any tentative indications or notice about was how the Commission intended to approach the waivers, and the bulk of the comments were addressed not to whether or not there should be waivers and the rule retained. It was really very much a why the rule should be retained, the rule should should be eliminated, but you were on notice that local markets would be considered. Yes, yes, indeed, Jessica, we were on notice, but that brings us up to the New York Times op-ed and the press release from the FCC chairman unilaterally issued. Let me ask a question on that. Is that relevant? I mean, in effect, if it's irrelevant, don't you just look back at the 2006 order? You said that that was cryptic. Yes, it was certainly a lot less than the 2000, it was 2001 notice, not 2002. The 2001 notice was like 16 pages, but if you look at the 2006 order, it basically seems, when I looked at it initially, yeah, there's a problem, but then you say, okay, everybody knew that there had been a ruling from this court, and everyone knew what the state of play was in connection with the 2001 notice, and it looked like the 2006 notice was a further notice in any event, which therefore would take the 2001 notice into account, and then I'm saying, well, how are you possibly prejudiced by that? Well, Judge Ambrose, the prejudice derives from these very vague, unenforceable exceptions, and in the case of the local news test and the failing station test, complete reversals of the presumptions that the Commission adopted. There was no opportunity to discuss, address in any way the nature of those provisions, which, as we argue, essentially swallowed the 20-market test and the top four element of it. I mean, part of that's because, I mean, there was criticism of the diversity index, and so they're looking at another way of dealing with some of the issues. Yes, Your Honor, and as we've indicated, the top 20-market test and the limiting it to the top four stations in the market is a generally reasonable approach, and we wouldn't have had a problem with that had it been validly noticed and had an opportunity to discuss it, and indeed, you know, there was some sense that the Commission might go somewhere. The problem arose was in these four factors that the Commission added, and then these two factors that the Commission added apparently overnight, in the wee early hours of the morning before the Commission vote, and this is the antithesis of the kind of reasoned decision-making where parties are on notice, parties have an opportunity to debate what the meats and bounds of the Commission's decision are. How were you prejudiced by that? Well, we were presented in response to the Chairman's press release, but the Commission did not have an opportunity to consider them. Notice is not just whether there's something published. Notice is an opportunity and an invitation to meaningfully participate. Where in the case of the second notice from the press release, before the comments were even submitted, the Commission had prepared and circulated a draft order, and a week after the comments were submitted, no replies, the Commission was ready to vote, and then as I've indicated, in the early hours of the morning, additional factors were added. This is the antithesis of reasoned decision-making, and I would suggest that the prejudice from the entire chaotic process... Let me ask you, is your problem with the notice, the timing of the notice, or is the problem with the content? The problem is with the content with respect to the original notice, which we think was insufficient and didn't fairly apprise us of the likelihood of waivers of the kind which were adopted here, and the problem with respect to the New York Times press release, New York aside from the obvious technical non-compliance, it was not voted by the Commission and not in the Federal Register, the timing of that made that a charade. That was not an opportunity for parties to engage in the process, nor was an opportunity for the Commission to engage in the quasi-legislative deliberation, which is anticipated. There was a healthy response, but it was a meaningless response, Your Honor. The order, two weeks before the comments were filed, the draft order was being circulated, and in the week which, between the filing of the comments and the Commission vote, it's not conceivable that the Commission could have reviewed this healthy response of comments and analyzed them and taken into account, and indeed there's no discussion of various objections that citizen petitioners and others made with respect to the terms of the top 20 market and top four station test which was adopted. If the notice was as important as you're saying, why in your opening brief that you only spend two pages on it, pages 26 to 28? Well, Your Honor, there was a lot to cover in a relatively small number of pages. I'll consider it was your first argument, but I think it was a big argument, as big as you're saying. I thought it would be more. Well, Your Honor, it's very important to us. It's just not that much to say. It did not fairly apprise us, and for the reasons, you know, stated there, and I'm providing here, there was not too much more to say. This simply did not give us an indication of what the Commission was planning to do, how it was going to apply presumptions, what stations would be involved. There certainly was no discussion of grandfathering and waivers, and so it doesn't take long to address something that's so basic, and as I've said, part of our notice argument is really inextricably intertwined with our larger argument about the arbitrary and capriciousness of the decision-making process as a whole. This is not what the Administrative Procedure Act anticipates, and we've explained in our brief, quoted from the dissent, this was, the public was, according to Commissioner Copson, his dissent, treated like chumps. That's, that cannot be divided from the notice process. You can move on. Thank you, thank you, Your Honor. With respect to the merits of the newspaper broadcast press ownership rule, we consider the four factors that the Commission added, again, without effective notice, to be vague and unenforceable. Apparently, again, we know from the dissent, language that would explain something about how these were to be enforced was dropped from the final decision in the wee hours of the morning. But why isn't that something, these factors, you look at them, and on its face, whether the proposed merger will increase the amount of local news disseminated, whether each of the combining media outlets will continue to exercise independent judgment, the level of concentration in the market and the financial condition involved, those seem on the surface to be pretty good factors to take into account. And isn't that something that the SEC has the discretion to sort out on a case-by-case basis? Yes, the SEC does have a lot of discretion, but let me, let me take, take two of them. First of all, with respect to, to the independent news judgment, how can that possibly be enforced? Indeed, the broadcasters have had problems with it for essentially the same reason. Is somebody going to sit in the newsroom and say, you know, wait a minute, the newspaper and the television station are, are, are jointly making decisions about how to operate things and call the FCC? I didn't get the impression that the FCC is going to dictate what the newspaper's content should be, but simply to monitor to ensure itself that there are independent views. Well, there, Your Honor, there is no way to monitor on a day-to-day basis what the independent news judgment is if the broadcasters say so. And if, and if the broadcaster says, we will maintain independent news judgment, and the FCC says, well, you've met the, the, the presumption, that's fine. As we've indicated, there is no effective enforcement mechanism. Is it your position that it's an impermissible factor, or that it has to be defined with greater specificity? It has to be defined with greater specificity, and there would have to be, as there would with all these factors, some sort of enforcement mechanism. As we showed in, in our reply brief, the Commission says, oh, well, you can test it on license renewal. That's once every eight years, and in order to prevail on a license renewal in wake of the 1996 amendments to the Communications Act, you have to show much more than a mere violation of an order. It has to be an, an extreme practice. There, so there is no effective license renewal enforcement provision available. With respect to the amount of news, that, Your Honor, while the Commission has discretion, is asking the wrong question. The, the issue and the purpose of the Newspaper Broadcast Coordination Rules is to provide, provide diversity. More news from less diverse sources, which is what that can result in, does not further the purposes of the Newspaper Broadcast Cross-Ownership Rule. It's, it's essentially unrelated. So, so we consider that to be an arbitrary and, and, and capricious factor. The, the local news test, which was added overnight, and is an absolute reversal of the presumption. It's not merely a factor. It, we know from the record that there is a process described in, in Joint Appendix 21-22 by, by AFTRA and Consumers Union's comments at 35. There is a procedure now in which broadcasters have eliminated local staffs and have created regional news hubs hundreds of miles away and broadcast purportedly local news in, into these distant markets. Is that local news? We have, we have no definition. Is it locally originated? And, and the other problem with the local news factor is that there is no data at all pertaining to what broadcasters do now. There is no FCC record-keeping requirement or other reporting mechanism to test whether or not there are these seven hours of claimed additional news. There's, there's just no way to find out if that's meaningfully being complied with. But you're talking now about an exception to the negative presumption, but what other factors would you add to the four-factor test? The financial distress, which is there, we don't, we don't have a problem with. I don't think we would have a problem with a, a local news consideration if it were adequately defined and the Commission adopted some sort of enforcement mechanism. And I might also... You give a number of examples of where enforcement in the past was perhaps failed or was lax or whatever, but what mechanisms would you put in place to make sure that there is sufficient enforcement? Well, the Commission could have a complaint process and, and could set it up in a way that would result in, in, in a hearing that could result in a designation of a, of a license renewal. The Commission has authority to require a license renewal application to be filed early, for example, or to initiate a revocation proceeding, although revocation is essentially an The Commission certainly could fashion something. Our point here is, is what they did do is vague, unenforceable, and cannot be effectively complied with. Your Honor, I have about four minutes left. So I want to know if you would like to discuss the waivers? Yes. Okay. Yes, we would like to hear the waivers and the jurisdictional Okay, well, with respect to jurisdiction, the critical thing that I would, I would point out is if you look at the ordering paragraphs, paragraphs 158, 159, and 306 of the Joint Appendix, it does, they do not grant or deny any license applications. The magic words, application granted or application denied appear in the cases where Section 402B jurisdiction is applied. Let me, maybe, maybe, maybe you can help me here. Is there any difference procedurally between granting a permanent waiver in the text of an order that adopts rules, which we're now reviewing, or granting a waiver that's valid for a license term through the FCC's normal licensing process? Yes, there is a very significant procedural difference, as you can see. If you look at Appendix E of our brief, in a separate order, some months later, the applications were granted, but they determined that the permanent waivers granted in the order before you were dispositive and that petitions challenging the renewal of the application were moot. This is a shell gag. So the procedural... Is it a timing issue? Is it a timing problem? Well, in a sense, it is, Your Honor, because in the cases where Section 402B review is had, there is sometimes a package of decisions where the principal decision is the license action, and then there may be an ancillary rulemaking or something like that. For example, in the Hubbard case, which is cited in the briefs. But isn't the granting of a waiver a necessary antecedent to the license? Well, it's typically done concomitantly. In this case, though, it's done in a rulemaking context, and that is reviewable as a rulemaking decision, and indeed, as we noted, this is exactly what the Supreme Court did in FCC v. NCCB. Was the portion of the 2008 orders granting the permanent waivers that you object to a modification of a license? No, it was not, Your Honor. What was it then? It was simply an indication that when the Commission gets around to considering the then pending license renewal applications, it would apply that waiver. But there is no opportunity to review the decision or consider objections. Section 309D2 of the Communications Act is the standard for granting license applications. But doesn't... one could make a good argument, I would think, that this fits under 402B6. And obviously, 402B, decisions relating to licenses, we don't have jurisdiction over. So it says under B that appeals may be taken from decisions of the Commission to the United States Court of Appeals for the District of Columbia in any of the following cases. And by any... and two, by any applicant for the renewal or modification of any instrument of by any person who is aggrieved or whose interests are adversely affected by any order of the Commission granting or denying an application described above. Well, as I said, Your Honor, the magic words are missing. And the magic words appeared in the subsequent order that's reprinted in Appendix E. And the Commission said we could not review that. The Commission said that was moot. So we're being... we're being given no effective opportunity to respond. And as I was saying, Section 309B2... But other than common cause, who really objected to that? Well, there were several, several parties that had filed petitions to deny, which the Commission refused to consider, Free Press and others. But the... But you did not, right? Well, Prometheus did not. Free Press is part of this. Free Press, at this moment, did object. And that was considered to be moot. Is it sufficient that common cause raised the objection so that the FCC was unnoticed? Well, common cause filed an application for review. But the... But applications for review can be dismissed without any explanation of reasons under the Commission's rules. And they've already said it's moot. They're going to rely on what you do here. Okay. Good. Thank you very much, Mr. Schwartzman. We'll have you back on rebuttal. That's right. Good morning. Good morning. May it please the Court, Corey Wright for Citizen Petitioners. It's well established that an agency rule will be determined arbitrary and capricious if the agency either fails to review relevant factors or ignores an important aspect of the problem. In the case of the rules being challenged today, the Commission did both. And with my time this morning, I'd like to address these omissions with regard to two specific issues. First, in retaining the local television ownership limits, the FCC failed to consider the competitive impacts of the digital television transition. And second, with regard to female and minority ownership, the FCC failed to comply with this Court's direction on remand and also failed to consider the impact of its numerical media ownership limits on opportunities for these groups to become owners. And with the Court's permission, I'd like to begin with the local television ownership rule. In maintaining the existing local television ownership rule, the FCC failed to consider the competitive impact of the digital television transition. This was arbitrary and capricious under the APA. It also ignores the directive that... The digital transformation became official when? In the summer of 2009? That was the formal conclusion. However, broadcasters began broadcasting in digital well before that. In fact, in our brief, we cite to a 2005 FCC order, which determined that over 85% of broadcasters were already broadcasting in digital. But at the time of the 2000 order, it wasn't complete transformation yet? It wasn't complete, but it was certainly a significant market change, and I think that it's the type of change, the type of competitive impact, that Section 202H explicitly directs the FCC to review in the context of the quadrennial review. But just looking at this, if you're in 2008 and you're the FCC and they decline to consider the possible future benefits of multicasting, isn't that something that would be taken care of in connection with the 2010 quadrennial process? I don't... With hindsight? I don't think that this court's instruction or the court's instruction in Sinclair, which is the FCC can't take a wait-and-see process to its rules, is permissible. And I also don't think that the fact that the FCC failed to take into consideration a relevant marketplace change in the 2006 order is remedied by the fact that the FCC may do so in the 2010 review. The quadrennial review proceedings sort of rinse and repeat nature doesn't excuse failure to consider relevant factors in the 2006 review itself. One of the... Can you suggest if the FCC had taken into account the digital transition, if it would have made any difference? Certainly. Petitioner, United Church of Christ, pointed out that one of the things that the digital transition accomplishes is that it allows broadcasters to multicast. This means that they can simultaneously air multiple television channels with a single broadcast license. As a consequence of the transition, broadcasters each now own at the very minimum three channels, potentially many more depending on technology, without needing to purchase a second or even third station. In declining to tighten the limits on the local television ownership rule, the FCC premised its judgment on certain efficiencies which broadcasters claim can be achieved through common ownership of channels. What the FCC failed to consider was that these same benefits could also be accomplished through digital technologies. In fact, petitioner... And you and others will be commenting on the process with respect to the 2010 review, correct? We intend to, yes. But as a practical matter, I don't think that excuses the FCC's failure to take it into consideration beforehand. UCC, in its comments before the commission, advocated that the FCC should have indeed tightened its rule because that would have been more consistent with marketplace changes and its competitive goals. Maybe I missed it, but how does that affect the EIA diversity issue? A separate issue, but it actually affects it in a very conclusive way. By tightening the local television ownership rule, that would have freed up stations for purchase that could have been purchased by women and minorities, thereby advancing the commission's goal of advancing opportunities for ownership by those groups. I think that the FCC's point that it would have been premature to consider the digital transition is also undermined by the fact that the FCC considered the transition in the context of other rules. In 2004, the FCC adjusted the children's television programming obligations of local broadcasters specifically because it realized that broadcasters would be engaging in multicasting. I think the fact that the FCC addressed the digital transition in the context of one set of rules and not in the other without any explanation is itself problematic under the APA. So for that reason, we're actually asking the court to remand the rule back to the FCC with instructions to consider the implications of the digital transition on its local television ownership limits. Moving to my second point, which is the issue of female and minority ownership, the low levels of ownership by these groups is a problem that has obviously been recognized by the FCC and by Congress. This court acknowledged it in Prometheus when it directed the FCC to consider proposals for advancing minority and female ownership. What do you make of the FCC's contention that they're trying to find out exactly how many stations are in fact owned by females and minorities, but they haven't gotten over that yet, so they can't really address the issue? I think that that argument is actually belied by the fact that it's true that the FCC has had a number of data problems and the order in 2009 to reform some of them was certainly welcome. However, it's not accurate to say that the FCC did not have the data it needed to conduct that assessment. In fact, while the FCC's method of summarizing the data on its website and providing that to researchers was very, very incomplete and faulty, the actual 323 ownership report forms themselves contained relevant data. In fact, Petitioner Free Press hand-reviewed thousands of those forms and created a review of female and minority ownership, which the FCC itself did not do, and submitted that into the record in the quadrennial review proceeding. For which of the 2008 rules do you think that there was a detrimental effect on diversity? I certainly think that the local television ownership rule was one. As I indicated earlier, if that rule had been tightened, it would have freed up stations for purchase. Similarly, the radio ownership rule, that is a market which is much more achievable in terms of entry from women and minorities who tend to be very... Could you elaborate on what you mean by tightening? Tightening, so Petitioner has advocated in comments to return to a one-to-a-market restriction for local television ownership. Because of the digital transition, the efficiencies of duopoly ownership appear to be obviated by returning to a one-to-a-market license. The stations that would be freed up for purchase could benefit new entrants, including women and minorities. The FCC went from a three to a two. I'm sorry? I thought the FCC went from a three, you can own three in the market, to a two. The current rule in effect is the 1999 order, which permits one entity to own two markets, excuse me, two television stations in a single market, subject to the four, top four, and eight voices test. But previous to that, it was a one-to-a-market rule for local television. And by freeing up those stations, minorities and females could have greater opportunities to participate. The FCC ignored a substantial amount of evidence that was submitted in the 2006 record, demonstrating that existing levels of consolidation had adversely impacted minority and female ownership. Free Press submitted research and analysis showing that minorities and women tend to be very susceptible to local market pressures of consolidation. They are more likely to be owners in markets that are competitive. They are less likely to be owners in markets that are concentrated. Are you discounting the efforts underway to get better information and saying that it really is not going to help very much in addition to the fact that you're saying that there was sufficient information to make rules changes? I don't think that I intend to discount the efforts that are underway. As I said, they're very welcome. They're changes that need to have happened. But it doesn't excuse the FCC's failure to have looked at this data initially when it was present in the record before it. The FCC's failure to consider at all in the order the impact of its numerical ownership limits on minority and female ownership seems to be ignoring an important aspect of the problem, which is what this Court instructed the FCC not to do the last time we were up at bat here. Does it make sense, Ms. Wright, to perhaps instruct the FCC to consider this issue in its 2010 rulemaking procedure at a point at which it would have, I suppose, all the data that it's looking for? The remedy that we're requesting is that the rules be remanded with specific instructions to consider numerical limits on female and minority ownership. I understand that the FCC is still trying to fix some of the data problems from 2009. It does have existing data, but our hope is that going forward that it will be able to do a better job of making those assessments. The last time around it made no assessment whatsoever. Thank you very much, Ms. Wright. Ms. Seitz? May it please the Court, Virginia Seitz, on behalf of the deregulatory petitioners challenging the newspaper broadcast cross-ownership rule. Ideally, I'd like to cover three ways in which the rule violates the APA, one constitutional argument, and then make one brief point about remedy. In 2003, the FCC concluded that the cross-ownership ban did not serve any competitive purpose, was harmful to localism, was unnecessary to protect diversity, and that there was a growing array of media outlets. What they were trying to do, you had the ban put in place in 75. 2003, they said, okay, times have changed, we need to look at this. But it looked like what they were trying to do was a balance. That balance, however, though, resulted in a rule which eliminated all restrictions on cross-ownership in 170 of the 210 markets. Now, this Court, in large part, affirmed a lot of the findings underlying that rule and then sent it back. In 2008, the FCC itself affirmed those same findings and found growing sources of media diversity and concluded that we had a newspaper industry in crisis. Could you comment on the Milieu study? I'm pronouncing it M-I-Y-E-L-O. Yes. Could you comment on that and how that supports your position? That supports our position in a couple of ways, but most notably in that the FCC did not mention it as a factor relating to diversity in this order. And our second APA argument is going to be that on this record, you simply can't justify a rule that results in restrictions in every single market area, some restrictions in every single market, and a strong negative presumption in 190 out of 210 markets. Was there a problem with the focus of that study? Was it focused solely on radio or television or one or the other? No, it focused on two things. It focused both on the benefits to localism of eliminating the cross-ownership rule, and it pointed out that there was no correlation between cross-ownership and the political slant or the viewpoint. Well, it did say on page 3877, quote, there is little consistent and significant difference in the partisan slant of cross-owned stations and other major network-affiliated stations in the same market. Right, and it said market forces are the best predictor of slant rather than cross-ownership. So in the only peer-reviewed study that commented on this issue, what was found was that there isn't a correlation, that there aren't viewpoint diversity-protective purposes of the cross-ownership ban. On page 2, when I look at the 2008 order, I think it's at 255 of the appendix, they did talk about the evidence that ownership can influence viewpoint. It looked to me like they gave it some serious consideration. If you look at the order, what they cite to, and the only thing they cite to, are comments that say that ownership as a general matter can influence viewpoint. In particular, they point to newspapers and the Internet sites newspapers operate as having overlapping content. Right. That kind of skimpy evidence cannot support the dramatic retrenchment that occurred between a rule that would have said no restrictions in 170 markets to a rule that says some restrictions in every single market and a strong negative presumption in 190 out of 210 markets. That kind of retrenchment without a reasonable explanation violates the APA, and this kind of dramatic restriction on this skimpy evidence, and we don't even think the newspaper-Internet analogy is a good analogy. Well, I was going to ask that question. Do you think the Commission gave sufficient weight to the Internet news? No. I mean, the other way in which this order violates the APA is its inconsistencies, and one of its inconsistencies is the way it treats, for example, radio, cable, Internet as voices to be considered in diversity in certain rules and voices not to be considered for purposes of diversity in other rules. It indicates in the general discussion that Internet has assumed a growing importance, but then it gives it no weight, for example, in determining what it means to have major voices left in the market in the newspaper broadcast cross-ownership setting. So there are three different ways we think this rule violates the APA. It's an unexplained retrenchment from the previous rule. It isn't sufficiently supported on this record, and it's riddled with inconsistencies, the general theme of which is very hard to pick out except that newspapers get the short end of the stick. So we think for all of those reasons this rule violates the APA, and I want to say particularly if you think about 202H and the requirement that in each quadrennial review the FCC must justify anew these restrictions, it's very hard to understand how on this record, which involves simply citing to evidence that newspapers and their Internet sites overlap with respect to content, how could that be sufficient to support a rule that has restrictions on cross-ownership in every single market, particularly when you consider that a record created in 2003 was not found to be sufficient to support restrictions in 170 out of 210 markets? If you deregulate and get rid of this rule, what do you have? You have companies that can own as many newspapers and televisions and radios in the same market. Would that be the result? The remedy that we're asking for at this point is vacater, or at the very least. Reconsideration? Or at the very least telling the FCC, look, you have 120 days to try to come up with a rule that's lawful, because it's been years now. Isn't the first? Go ahead. I think the FCC is trying to preserve some sense of viewpoint diversity, and one of the ways to do that is this rule. What you're advocating is eliminating this rule, and what is that going to do for viewpoint diversity? I'm saying that the record in this case doesn't support the FCC's conclusion that this rule is necessary to protect diversity. The only thing that the FCC points to is this evidence that isn't even evidence that relates to newspaper broadcast cross-ownership. Now, of course, you still have, even if this rule weren't in place, the FCC's consideration of general public interest factors in allowing any combination. So the end of this rule doesn't mean the Wild West. There still would be the traditional public interest inquiry. And, of course, the FCC still has an opportunity to try to come up with some way to justify a limitation. What's the criticism of the case-by-case approach? Well, it's impossible on this record, in light of the fact that the purposes aren't served by any limits on cross-ownership restriction, to justify a case-by-case analysis in markets with burgeoning viewpoint diversity. What would be the possible benefit? It almost seems like that knife cuts both ways. It might be an argument for why you would want to have case-by-case considerations under these various tests, because there are so many differences that need to be taken into account. There is no way in markets that already have substantial viewpoint diversity that this rule has a significant marginal impact, that cross-ownership restrictions can be justified. I mean, there are already markets with hundreds of voices out there. There are markets with – many markets with nine or more major TV stations. In those markets – I mean, you all know the cost of litigation. If you litigate every single request for a combination, there should be some reason to force parties through that process. There is nothing in this record that could support that. And 202H, Congress said, we don't want to place unnecessary roadblocks like cross-ownership restrictions in the way of these transactions unless there's a very solid justification for them. Let me ask a variant of Judge Ambrose's question. Given the fact that you favor deregulation, at least to a point, how onerous is the case-by-case approach, really, with the presumptions? And certainly, except for the top four presumptions in your favor. Well, the presumption in our favor, except for the top four, is only in the top 20 out of 209 markets. Right. I understand. There's a very powerful negative presumption that means in 190 markets. So that kind of reverse field is also extremely onerous. And the four-factor test, of course, has the other problem we identified, which is that it's unconstitutional. It requires the agency to look at and to consider, and it's sort of balancing whether or not to look at the content of what is going to be offered by the new station. This isn't a rule that says- But didn't the Supreme Court say in, what, 78 or so, that when you got scarcity, so much- And this isn't a rule that turns on- This is a rule that accepts the validity of the scarcity doctrine and instead says what this particular four-factor test does is require the FCC to pursue constitutional goals of diversity, viewpoint diversity, and localism, but to do it in an unconstitutional manner, which is- And competitiveness. I mean, the three things, localism, diversity, and competitiveness. And I just would point the court to footnote six in the Turner case, which in addressing a low-power television station says that would favor low-power television stations because they would, quote, address local news and informational needs not adequately served elsewhere. And the court says, we recognize that appears to single out certain low-power broadcasts for special benefits on the basis of content. And that is exactly what the FCC would be doing here with this four-part test. I see I've run well over my time. Let me see if my colleagues have any other questions. Good. Thank you very much, Ms. Seitz. Goldenberg? Good morning. Good morning, Your Honor. Elaine Goldenberg, and I'm here representing the deregulatory petitioners with respect to the local television rule and the radio-television cross-ownership rule. This court emphasized in its opinion seven years ago that the FCC has an obligation to affirmatively justify its rules and to take a hard and serious look at the realities of competition in the marketplace and to get rid of any rule that's not necessary in light of that competition. In the 2008 order with respect to the rules I'm addressing, the FCC has not fulfilled that obligation. It's returned to the 1999 version of both of these rules with very minimal discussion of or justification for its change in position or for the fatal inconsistencies that the D.C. Circuit already identified. It seemed like on the joint appendix 280-283 they were trying to say that, look, we're going back because this is a way to protect competitiveness. Well, they do have one paragraph discussion of the change in position where they say, yes, it's true. We concluded in 2003 that this rule actually undermined competition. Now we're going to change our minds. And I would really urge the court to look at what's cited in that paragraph of the order, which is paragraph 101. It's extraordinarily thin. The conclusions that they reached in 2003 about competition were based on empirical studies, empirical evidence, and this court upheld them on that basis. This time around they cite to a few scattered comments which are very conclusory, very anecdotal, and there's basically two pages of those comments actually include any studies at all. Those studies are one of them is based on 1998 data. The other one is by someone named Yan who the FCC itself criticizes very heavily in paragraph 45 of the order as having poor methodology, doesn't have a peer-reviewed study, it's just a working paper. So the evidence is really extremely thin for that change in position. And, again, under 202H the FCC has a real obligation to take a look at what's actually happening in the marketplace. There's tremendous evidence on the other side in the record that the FCC didn't address or seem to consider, showing that, in fact, the 2003 order's conclusion was correct. Did they really fail to consider the increase in media outlets since 97? Yes, I think that is one thing that they failed to consider with respect to this rule. That's the sort of voice count problem or market definition problem that the local TV rule has, and I do think that's an extremely significant problem given the way that things have moved, especially since 1999 but even since 2003. The order itself acknowledges this in sort of the early parts of the order they had. I thought what they said was that despite those developments, the increase in media outlets, that the rule continued to be necessary for competitiveness purposes. Well, what they say in those paragraphs is despite those changes, local TV and newspapers are still the leading sources of local news. But that isn't a justification for not considering at all. Isn't that not true? Is that true or not true? Well, I think that's supported in the order based on the record that existed at the time, although things are constantly moving. But that isn't any – I don't think that's any excuse for not considering at all the competitive impact of these other outlets, particularly when you consider the inconsistency between the voice count that you have in the local TV rule and the voice count that you have in the radio-TV cross-ownership rule. If you deregulate, you end up with one media giant perhaps owning all of these significant media outlets in this market. I don't think that's at all true, Your Honor, for a number of reasons. But it's entirely possible, isn't it? I don't think so, Your Honor, because – for a number of reasons. First of all, the commission has an obligation every time there's a proposed transaction to look at it in light of the public interest. What these rules do is create a sort of automatic rule in advance where they can say, no, you don't meet our test, you can't do your transaction. But if there were not the restrictions of the local TV rule, and we are asking for that rule to be vacated, then the commission would still every time have to say with respect to a particular transaction in a particular market, does this serve a public interest? And sometimes perhaps it would conclude that it did not. In addition, you have the antitrust authorities in the background who are able to enforce the antitrust laws and to make sure that there aren't transactions going on that have anticompetitive effects in a particular market. And also beyond that, the FCC could always order divestiture if it were able to later justify some more restrictive rule. And I'd point the Court to the Fox and Comcast decisions of the D.C. Circuit, which vacated media ownership rules and are discussed in our brief, that talk about exactly these kinds of factors when they say there's no justification for this rule. The FCC's had a chance to justify it before. It's failed to do so. We're going to vacate it. And the one other factor they talk about, which I think is also true here – But at that time in Fox, cross-ownership was prohibited, right? Yes, that's right. In 78 or whenever it was. Right, but nevertheless, I think all those factors – No, Fox was 202. I'm sorry. I'm sorry? I think Fox was 202, wasn't it? Fox was, yes. That's right. I do see these rules as a friendlier to viewpoint diversity than what you're suggesting, and maybe you could tell me why that's wrong. Well, I think that the FCC has disclaimed any protection of viewpoint diversity with respect to its local TV rule, although we don't agree with that. With respect to the radio-TV cross-ownership rule, which I would like to use at least a little bit of my time to address, the stated justification for that is diversity. But again, the commission hasn't grappled at all with what's happened in the market since its last order and with the conclusions that it actually reached in 2003 with respect to diversity and whether there was a need for that cross-ownership rule. In 2003, when there was much less diversity than there is now because things have changed a lot since then, the commission said we don't need this cross-ownership rule for diversity purposes. And now, again, a very short conclusory section of its order, just a few paragraphs long, virtually no analysis. They said, oh, we changed our mind. Now we do need it. I thought what the FCC said was that the two media, TV and radio, serve as substitutes for each other with respect to, for example, news, which the local ownership rules do not take into account. They don't address. Well, the local ownership rules do put significant restrictions on what someone can own in a particular market. For instance, just to take an example, in the largest markets, under the local TV rule you can own a maximum of two TV stations, and under the local radio rule you can own a maximum of eight radio stations. The restriction under the cross-ownership rule in those markets is two TV stations and six radio stations. So are you challenging the eight voices rule or what? Well, yes, we are challenging it. And I understand that there's an interplay between those two rules, and the FCC would have to, in its next review, look at that interplay and decide how those rules should work, whether there should be rules in this area. But nevertheless, under the FCC's own justification, as given, it's clear that the look at what they're saying when you strip it all away, look, we're going to give you the authority to buy a second radio station instead of a second television station in certain cases. And so what's so wrong with that? Well, I think the FCC has to explain why it is that there's a need in order to protect diversity to put these additional restrictions. And they didn't explain that at all? On people in the marketplace, they didn't explain it at all, particularly when you look at the change in their conclusion from the 2003 order. Well, that's Mr. Lewis on that one. If I could just take – sorry to jump around between roles, but just take just a moment to address the argument that we heard earlier on the local TV rule with respect to the multicasting. I have a few things to say about that, although I see my time is about to run out. First of all, as I'm sure you'll hear from the FCC, at the time this order was issued, the digital transition hadn't even happened yet, and it was actually ultimately delayed by several months, and so there's no reason that had to be accounted for in the rule. But beyond that, there are just a couple of reasons why the argument that we heard before just misunderstands the FCC's conclusions about the efficiencies of ownership. First of all, you can multicast all you want, but it doesn't matter if no one can hear you. And under the must-carry rule governing cable and satellite, which is the way that most people watch television, they only have to carry a primary stream. So even if people are broadcasting secondary or tertiary streams, if no one can hear them, it doesn't make any difference. In addition, stations use that extra bandwidth that they have to do other things. They may broadcast in HDTV, which would be just one stream. They may support their main programming with something called mobile TV, where you can get it on your handheld device. There may be a number of other things they can do. And in addition, it's just extra cost for a station to start multicasting. It's not the same thing as coming under common ownership with another station that may already have a local news operation, where you can actually start up local news, and you can have revenues with which to do so. And so for all those reasons, there's no, I think, no justification for the kind of change in the rule that we heard advocated for. Good. Thank you very much. Thank you. Ms. Walker? Good morning. May it please the Court, Helgi Walker for petitioner Clear Channel. I will be addressing the local radio ownership rule. Almost seven years ago, this Court held that the FTC's decision to retain the numerical limits and the subcaps of the rule was arbitrary and capricious. This Court explicitly instructed the Commission on Remand to produce additional justification or modify its approach. The Commission has done neither. Didn't it cite to the study to which Clear Channel referred? The Commission has not produced any addition. On JA-289, I thought it did. Are you talking about the retention of the rule and the question whether the Commission ignored our evidence or not? Our evidence they ignored. Clear Channel's extensive comments. You said they ignored your evidence on concentration. Yes. Pardon me? I thought you argued that FCC ignored your evidence on concentration. We did. Our evidence consisted of our comments and the study submitted by Professor Hausman. That evidence was entirely ignored. They cited one of their own, two of their studies that conflicted with each other, and an old study from the 2002 proceeding. But normally they have the right to look. We're going to credit certain evidence. We're not going to credit certain evidence. How did we get involved in that? And that goes to the decision not to repeal the rule. And we believe for the reasons in our brief that was wrong. But what I wanted to use my time on with this Court are the two issues that you previously found to already be unlawful, and that was the decision to retain the specific numerical limits of the rule, which they've not, again, properly explained. They have not followed your instructions on remand, and they have also retained the AM subcaps. Previously you found that decision was arbitrary and capricious. They haven't properly explained that issue either. So if I could get back to the numerical limits, you specifically directed the Commission on remand, and again, even if they provided a rational explanation for not repealing the rule entirely, which Judge Ambrose, the arguments you and I talked about go to, they have certainly not responded to your unambiguous directive, and I quote, to develop numerical limits that are supported by a rational analysis. On remand, of course, the FCC chose not to develop new limits. They really reinstated the old rule for what is now the fourth time. They have disclaimed their reliance on the five equal-sized competitors rationale, and they now simply assert that relaxation of the rule will be inconsistent with their public interest objectives. That explanation, we submit, is vexingly terse, wholly circular, and an inadequate response to this Court's order on remand. So what would you do? We think that you gave them one fair chance to explain, as you said, to develop numerical limits that are supported by a rational analysis. They have not developed new limits. They merely reinstated the old ones, and the reasons that they gave for that are woefully insufficient. That relaxation of the rule doesn't fulfill the public interest objective is completely circular and conclusory and insufficient. To the extent they actually address the utility of the limits, Your Honor, in paragraph 118, they fell back on the need to protect against excessive market concentration. But that's a reason that goes to the need to retain the rule itself and doesn't justify the selection of these particular limits. In Prometheus 1, you expressly distinguish, Judge Ambrose, writing for the Court, between the numerical limit approach, which you upheld, based on record evidence of consolidation, and the specific numerical limits at issue, which you said were not rationally explained. Finally in the order, the only other thing the Commission says on this issue, in an apparent burst of candor, is that they have no intention of, quote, tinkering with the limits, and again I quote, merely to suit a new rationale. But a new rationale is precisely what this Court required in Prometheus 1, and indeed what this Court required was a rational rationale, and they still have not done that. But what they've done here is it's not a new rationale for something that they then had in place. They've gone back to the old rule, and the argument then you'd have to make is they haven't given any reason for going back to the old rule, or if they gave a reason, it was so deficient that it's arbitrary and confusing. Your Honor, they put back in place, retained exactly what was before you in your 2004 decision. It's not anything different. I thought they put in place what was pre-2003. The numerical limits themselves, you shall not own more than eight stations, and the top 45 markets have been unchanged for the last 15 years. In each four-periodic review, the Commission keeps reinstating them. There's nothing different with respect to that. But what they did do here was for the AMFM subcaps, let's just take diversity, they did give reasoning for why they thought that those subcaps should stay, and they gave the diversity reasons. What was wrong with those reasons? Well, again, what we believe is that they responded to your directive to come up with a rational analysis for retaining the subcaps as an entity, and they responded with the same generalized assertion that they did before about market and technical differences between AM and FM stations. That's a pretty skimpy assertion, to use Ms. Sykes' language, and it was no better supported this time than it was before. Out of the 167,000 comments that were filed in this proceeding, the Commission could produce two citations for that conclusion. First, Claire Channel's own comments, which advocated for elimination of the subcaps and therefore distorted their meaning, and the second piece of evidence was a recycled study from the 2002 proceeding. The Commission may not rely on evidence from prior periodic reviews. You're saying the FCC offered no rationale for the AMFM subcap rule? Their rationale was the same generalized assertion that they gave to you before and that was previously found to be inadequate. And also, Judge Fuentes, what they didn't do was address the particular inconsistency that this Court identified in its opinion, and that is the agency's conflicting mindset on the relative value of AM versus FM stations. You pointed out in your opinion that that seemed arbitrary, that that seemed internally inconsistent. In this order, in the section dealing with the AMFM subcaps, they never came to terms with that issue, and in fact that's what you specifically instructed them to do. What about the impact of digital radio? The impact of digital was a reason that we gave why the AMFM subcaps issue would eventually go away. We think that's an additional reason, but we don't stand or fall on that. Our primary argument is that they did not grapple with the question that you specifically instructed them to grapple with, and they simply did not address it. So having had one chance to explain the decision to retain the numerical limits and the subcaps, having failed, you gave them the benefit of the doubt, a second chance, they still have not grasped and explained. We understand your position. Yes. Thank you very much, Ms. Fuentes. Yes, we think the rules should be vacated. Good. Thank you. Mr. Hayes? Michael Hayes on behalf of the Petitioner and Media General. This Court's February 8th order transferring all of the 402B cases to the D.C. Circuit because of its exclusive jurisdiction means, in our view, that the issue of this Court's jurisdiction over the Citizens Petitioner's Waivers challenge to the Media General Waivers is not before this Court. But I'd like to make, unless this Court otherwise would like to address that, I'd like to make two quick points on that, however. How is that again? Run that by me. You filed a 28-J letter on that. Yes. The logic of that order was that the D.C. Circuit has exclusive jurisdiction over waivers. Waiver issues are ancillary to or logically prerequisites to licensing decisions and, therefore, under well-established case law, are part of the D.C. Circuit's exclusive jurisdiction. And this Court, I believe, recognized that when it transferred those waiver cases, those 402B cases, which also addressed waivers, to the D.C. Circuit. Now, Mr. Schwartzman's argument there was principally that it must involve the grant or denial of a waiver, and that's simply wrong. Free press objected to the waiver, right, in 08? Yes. There were objections to these waivers back in 2005. As soon as the renewal applications were filed. Was anything done with respect to the free press objection? The current status is that there are now pending proceedings at the FCC that are addressing this issue. But it's been sitting for what, about three years? It's been sitting for some period of time, but there are administrative proceedings on that, and the FCC has said they will address that, will address these challenges to the waivers in that forum. So they do have a remedy, according to the FCC, in that forum. But I would also say that Mr. Schwartzman's position that the grant or denial of a license application is required is wrong. There are at least three cases that have not had a grant or denial of an application involved, where they have recognized the jurisdiction of the D.C. Circuit. There's Holden v. U.S., 379, Fed 3rd, 1344, Fidelity v. FCC, 502, Fed 2nd, 443. I mean, I think part of maybe the problem that they had, I mean, you had free press was objecting. You had common cause objecting, I guess, almost three years ago in March of 2008, and yet nothing's happened. I guess what their argument is is it's kind of futile for them to object. Is that right? Well, they have – they could have filed a 402B as well, Your Honor. I mean, they have – there is now a license. I thought – I mentioned that. That was – if they had a problem, they could have filed a 402B, which they deliberately did not do for whatever their reasons were. They could have filed a 402B. Other parties filed 402Bs in this jurisdiction, and those were transferred to the D.C. Circuit. I mean, part of the problem here is that the permanent waivers were modifications of the licenses in effect, but the decisions were made outside of the licensing context. So the question is, what do you call it? Do you call it a license? Do you call it a something else? Or do you say that, look, citizen petitioners, except for a couple of folks here, free press and common cause, really – nobody's really objected. That would seem to be a stronger argument than the one that you're making. Well, this is an adjudicatory decision that they made, Your Honor, that the FCC made. In the 2008 order? Yes, it was an adjudicatory decision. And they admitted it, and they admitted it was a hybrid order that contained these decisions. It was certainly a hybrid. There's no doubt about it, we would say. That had adjudicatory decisions in it, and they could have filed a 402B had they wanted to. They've got another – according to the FCC, they have remedies that the FCC wants the license renewals are ruled upon. And they can peel that as well. If you get beyond jurisdiction, I mean, general media or media general, it looks like something was going on here. It was 37 phone calls between the head of media general and the then-chairman. I mean, they don't look it through good. Well, Your Honor, there are efforts to make the lobby of the FCC all the time. There are reports that are filed on this. There are administrative remedies, if they feel that there was something done, which they have, in fact, pursued because they challenged these license renewals, which involve the waivers as well. They have challenged those at the FCC themselves. And they have whatever remedy they have. But the point is, when you look at this, just looking at – from 1975 to 2003, there were what? Four waivers given. And then all of a sudden, as part of the 2008 process, boom, at the last minute, there's five given. And you look back in the records and you see there's all these contacts. It just – and then you're saying that there's no jurisdiction to challenge. Well, maybe there's not. But if you get to the merits, it doesn't look great. No, Your Honor, there was jurisdiction to challenge, but it has to be done by a 402B within the D.C. Circuit. That's what they didn't do. They didn't follow that procedure. But they do have their remedy also. And I specifically asked that question, though. Yes, and they did do that. And you've got to look at the merits of these waivers. I mean, what the FCC said was – I thought you said I couldn't look at the merits of these waivers. Oh, you're right. I thought that was your argument. You can't. But the merits of these waivers are unquestionable. It's an abuse of discretion standard that the FCC applies in these circumstances. And there was no abuse of discretion here. So I'd like to – if I have a couple of minutes here. I'll give you one minute, sure. I would just like to point out something about the Milo study and the FCC's Paragraph 49. And that's the crux of this issue, is whether or not there was substantial evidence, which means evidence that a reasonable person would rely upon to support the conclusion. On the one hand, you have the Milo study, peer-reviewed, 300 tapes that were reviewed of local news broadcasts, multiple regressions analyses, cross-coded, a very reliable study. The FCC didn't mention it. On the other hand, you have footnote – you have the text of 49, which addresses a newspaper and a website. It doesn't even address the cross-ownership rule. And if you look at what is cited in footnote 169, there is no – they don't – the first site doesn't even refer to cross-ownership. The second site talks about an unidentified cross-promotional issue. And the third is a bare opinion. And so the FCC, they weighed these two things. They had the Milo study on one hand. They had this, you know, two unidentified examples and a bare opinion piece on the other. And which one did they go for? They went for the two unidentified examples. And that is an abuse of discretion. They had to have substantial evidence. They're stuck with what they said on the record because that's what the Supreme Court said in Burlington in the British courts case. And I would submit, Your Honor, that there is no substantial evidence that supports this rule. Mr. Hayes, thank you very much. Yeah, sure. Mr. Fiorini. Good morning. Good morning, Your Honor. May it please the Court, I'm John Fiorini, appearing on behalf of CBS, and I would like to talk about first the commission's dual network rule and then its local television rule as it relates to large markets. Last month, Comcast, the largest cable company in the United States, which among other things operates five national cable networks, acquired control of the NBC television network. And yet... Is that the small little outfit here in Philly, Comcast? That's the one, Your Honor. That small little building? That's the one, exactly. And yet, the commission's dual network rule precludes one network from acquiring another network that's named in the rule. There are four networks that are singled out in the rule. The commission thinks this is as it should be, because it continues to take the view that the four networks that the rule covers are unique and comprise what the commission calls a strategic group. But we think that this ignores the evidence of increased competition, even as it was shown between the commission's 2003 and 2008 orders. What they had done before, and I think what they've relied on again, is that there's a significant delta or significant difference between the top four and the fifth in terms of size. What they said in the 2008 order, Your Honor, was essentially... What they said was essentially that they were going to retain the rule for the same reasons they'd given in 2000. Yeah, that it would be, quote, deleterious of competition or something like that. Right. Deleterious of competition. But, you know, we think that they were obligated to do more than they did to take into account the increased evidence of competition that was in the record for the 2008 proceeding. They didn't really do that, we don't think, in any meaningful way. They simply said, we're going to retain the rule for the same reasons that we gave in 2003. But they gave a reason back then for the line drawings, did they not? They did. But they don't explain, at least in any meaningful way we don't believe, how those conclusions remain valid given the increased competition that was shown to be... that the record showed had developed in the interim. And, in fact, in modifying the newspaper rule in 2008, the Commission took explicit account of intervening changes in the competitive environment. That was one of the... Because of the financial situation with newspapers or for other reasons? Certainly in part because of the financial situation. That's correct. In short, we just don't believe that the Commission gave the dual network rule the fresh look that this court has said 202H requires. We also think that they have failed to take account of the fact that the antitrust laws really deal with the two markets that they've said that they're most concerned about. That is to say the program acquisition market and the national television advertising market. So for these reasons, we think that they fail to justify the retention of the rule. If I can move now to the local rule, local television rule, that is, as it relates to large markets. We agree with NAB and Ms. Goldenberg that the local television rule isn't necessary to protect competition and that in any case the competitive universe should not be limited to broadcast television. But if you assume that some restriction is necessary to preserve competition solely among television stations in a local market, the Commission still erred because nowhere does it even discuss whether combinations of more than two stations should be allowed in larger markets, which by definition have more stations. This court indeed noted in its opinion in Prometheus I that it was possible that a triopoly, that is to say a group of three commonly owned stations, could have a lower audience share than all the duopolies, that is the two station combinations in the market. Moreover, in its 2003 order of course, the Commission explicitly allowed triopolies. But you will not see one syllable, not one syllable in the 2008 order, devoted to why combinations of more than two stations shouldn't be allowed in larger markets. It's not there. There's not one syllable of discussion about it. The Commission says that it doesn't have to consider alternatives if the limit that it set was reasonable. We don't concede that it was reasonable, but we also would point out the Commission is obliged to give a reasonable explanation for its reversal of position. It had to consider all relevant information, including information it had about increased competition. You know, at some point the FCC has to draw a line. I mean, it conducts studies, it takes into account comments, and then it makes a decision. Isn't that within the discretion of the FCC or general agencies to make a decision, to draw a line somewhere? Well, yes. It's arbitrary necessarily. Not necessarily, but here, having decided in 2003 that triopolies, that the old rules were unnecessarily restrictive, and that in fact triopolies, three station groups,